IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

SHAVONYA D. MASON,                    )
                                      )
                Plaintiff,            )
                                      )
        v.                            )        1:21CV762
                                      )
KILOLO KIJAKAZI,                      )
Acting Commissioner of Social Security, )
                                      )
                Defendant.            )

MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Shavonya D. Mason ("Plaintiff") brought this action pursuant to Section

1631(c)(3) of the Social Security Act (the "Act"), as amended (42 U.S.C. § 1383(c)(3)), to obtain

judicial review of a final decision of the Commissioner of Social Security denying her claim

for Supplemental Security Income ("SSI") under Title XVI of the Act. The parties have filed

cross-motions for judgment, and the administrative record has been certified to the Court for

review.

I.      PROCEDURAL HISTORY

Plaintiff protectively filed her application for SSI on August 25, 2014, alleging a

disability onset date of July 1, 2006. (Tr. at 16, 371-88)[1] She later amended her alleged onset

date to August 26, 2014. (Tr. at 16, 393, 2016.)[2] Plaintiff's application was denied initially (Tr.

_____

[1] Transcript citations refer to the Sealed Administrative Record [Doc. #8].

[2] Plaintiff also filed an application for child's insurance benefits under Title II of the Act. However, Plaintiff
voluntarily withdrew her request for a hearing as to this claim in light of her amendment of the alleged onset

at 96-126) and upon reconsideration (Tr. at 127-200, 247-70). Thereafter, she requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 273-78.) Plaintiff first appeared at a hearing on August 28, 2017, but she requested a continuance at that time. Several months later, on December 6, 2017, Plaintiff, along with her attorney and an impartial vocational expert, attended the postponed hearing. (Tr. at 16.) The ALJ ultimately concluded that Plaintiff was not disabled within the meaning of the Act (Tr. at 27), and, on February 28, 2019, the Appeals Council denied Plaintiff's request for review, thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review (Tr. at 1-7).

Thereafter, on September 28, 2020, this Court issued a decision remanding the case for further proceedings. (Tr. at 2121-35.) Accordingly, on April 8, 2021, Plaintiff, along with her attorney and non-attorney representatives, attended a second administrative hearing at which Plaintiff and an impartial vocational expert testified. (Tr. at 2016.) Following this hearing, the ALJ again concluded that Plaintiff was not disabled within the meaning of the Act. (Tr. at 2027.) Because Plaintiff is appealing from an unfavorable decision after a remand Order from this Court, she was not required to seek review from the Appeals Council. 20 C.F.R. § 404.984(a), (d); 20 C.F.R. § 416.1484(a), (d). Instead, she is entitled to seek judicial review of the ALJ's decision in this Court, which she did with the filing of her Complaint [Doc. #1] on October 1, 2021.

---

date from July 1, 2006 to August 26, 2014. (See Tr. at 16-17.) Plaintiff acknowledged that, as of the amended date, she did not have the insured status necessary for a Title II claim. (Tr. at 16.)

## II. LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the

3

ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[3]

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is

---

[3] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 et seq., provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 et seq., provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1.

working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that a significant number of jobs exist which the claimant could perform, despite the claimant's impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its

---

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

5

"evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III.    DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" since her amended alleged onset date of August 26, 2014. The ALJ therefore concluded that Plaintiff met her burden at step one of the sequential evaluation process. (Tr. at 2019.) At step two, the ALJ further determined that Plaintiff suffered from the following severe impairments:

anxiety, depression, asthma, carpal tunnel syndrome, and obesity[.]

(Tr. at 2019.) The ALJ found at step three that none of these impairments, individually or in combination, met or equaled a disability listing. (Tr. at 2020-21.) Therefore, the ALJ assessed Plaintiff's RFC and determined that she could perform medium work with further limitations. Specifically, the ALJ found that

[Plaintiff] can frequently handle and finger bilaterally. She can have frequent exposure to pulmonary irritant[s] such as dust, fumes, odors, and gases. She can understand, remember, and carry out unskilled work of a routine nature. She can maintain attention and concentration for at least two-hour periods of time sufficient to carry out unskilled work. In the course of a normal workday [and normal workweek, she can adapt to routine workplace changes at a non-production pace (meaning non-assembly line or conveyor-belt type jobs). She can have occasional interaction with the general public. She can have frequent interaction with coworkers and supervisors, meaning work not requiring teamwork for task completion. There can be no driving required for the jobs.

(Tr. at 2022.)

The ALJ determined at step four of the analysis that Plaintiff had no past relevant work. (Tr. at 2026.) However, the ALJ also concluded at step five that, given Plaintiff's age, education, work experience, and RFC, along with the testimony of the

6

VE regarding those factors, Plaintiff could perform jobs available in substantial numbers in the national economy and therefore was not disabled. (Tr. at 2026-27.)

Plaintiff now raises two related challenges to the ALJ's RFC assessment. First, Plaintiff argues that the ALJ failed to properly consider opinion evidence from Plaintiff's treating psychologist. Second, Plaintiff contends that the social functioning findings in the mental RFC assessment are not supported by substantial evidence. After careful consideration of the entire record, the Court finds that Plaintiff's first contention merits remand, and the Court therefore need not reach Plaintiff's second contention.

A.    Dr. Rominger's opinion

Plaintiff first challenges the ALJ's evaluation of statements, dated November 27, 2017, and March 25, 2021, from Plaintiff's treating psychologist, Dr. Robert Rominger. The ALJ summarized the contents of Dr. Rominger's statement as follows:

> He opined that [Plaintiff's] difficulties getting along with people due to distrust and suspiciousness, and her unstable perceptions of others and magnified perception of emotional stakes due to her histrionic and borderline traits, would interfere with her ability to interact with people on a professional basis. She is likely to be limited in coping with other people, both one-on-one and in group settings. Most days, her anxiety is debilitating. He believes that in a work place she would flee when she became overwhelmed by anxiety.

(Tr. at 2025.)   Ultimately, the ALJ gave "little weight" to Dr. Rominger's findings. In doing so, the ALJ relied on the following rationale:

> First, [Dr. Rominger's] treatment notes show that he has not consistently treated [Plaintiff] and there was a period of from 2019 to January 2021 where she was not receiving treatment. Second, [Dr. Rominger] was "assisted" in preparing this by the law students and the pre-hearing brief is very close to identical to his opinion making it unclear how much of this is his opinion. [Third,] [Plaintiff] has not appeared to want to help herself as she refuses treatment and has a reason for nearly every medication as to why not to take it. In addition, [fourth]

it is not supported by evidence in the record, including normal memory, judgement, insight, concentration, and thought content.

(Tr. at 2025-26.)

For claims like Plaintiff's that are filed before March 24, 2017, ALJs evaluate the medical opinion evidence in accordance with 20 C.F.R. § 404.1527(c). Brown v. Comm'r Soc. Sec., 873 F.3d 251, 255 (4th Cir. 2017). "Medical opinions" are "statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." Id. (citing 20 C.F.R. § 404.1527(a)(1)). While the regulations mandate that the ALJ evaluate each medical opinion presented to her, generally "more weight is given 'to the medical opinion of a source who has examined you than to the medical opinion of a medical source who has not examined you.'" Brown, 873 F.3d at 255 (quoting 20 C.F.R. § 404.1527(c)(1)). And, under what is commonly referred to as the "treating physician rule," the ALJ generally accords the greatest weight—controlling weight—to the well-supported opinion of a treating source as to the nature and severity of a claimant's impairment, based on the ability of treating sources to

> provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) [which] may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(c)(2). However, if a treating source's opinion is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" or is "inconsistent with other substantial evidence in [the] case record," it is not entitled to controlling weight. 20 C.F.R. § 404.1527(c)(2); see also Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *4;

8

Brown, 873 F.3d at 256; Craig, 76 F.3d at 590; Mastro, 270 F.3d at 178.[5]  Instead, the opinion

must be evaluated and weighed using all of the factors provided in 20 C.F.R. § 404.1527(c)(2)-

(c)(6),  including:

> (1) the length of the treatment relationship,
> (2) the frequency of examination,
> (3) the nature and extent of the treatment relationship,
> (4) the supportability of the opinion,
> (5) the consistency of the opinion with the record,
> (6) whether the source is a specialist, and
> (7) any other factors that may support or contradict the opinion.

The Fourth Circuit has recently confirmed the application of the treating physician rule

in Arakas v. Commissioner, 983 F.3d 83 (4th Cir. 2020), and Dowling v. Commissioner, 986

F.3d 377 (4th Cir. 2021).  In Arakas, the Fourth Circuit "emphasized that the treating physician

rule is a robust one: '[T]he opinion of a claimant's treating physician [must] be given great

weight and may be disregarded only if there is persuasive contradictory evidence.'"  Arakas,

983 F.3d at 107 (quoting Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987)).  Thus, "the

opinion *must* be given controlling weight *unless* it is based on medically unacceptable clinical or

laboratory diagnostic techniques or is *contradicted* by the other substantial evidence in the

record." Id. (emphasis in original).  Similarly, in Dowling, the Fourth Circuit emphasized that

even if a "medical opinion was not entitled to controlling weight, it does not follow that the

ALJ had free reign to attach whatever weight to that opinion that he deemed fit. The ALJ was

---

[5] For claims filed after March 27, 2017, the regulations have been amended and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded.  The new regulations provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. § 404.1520c.  However, the claim in the present case was filed before March 27, 2017, and the Court has therefore analyzed Plaintiff's claims pursuant to the treating physician rule set out above.

required to consider each of the six 20 C.F.R. § 404.1527(c) factors before casting [the treating physician] opinion aside." Dowling, 986 F.3d at 385. "While an ALJ is not required to set forth a detailed factor-by-factor analysis in order to discount a medical opinion from a treating physician, it must nonetheless be apparent from the ALJ's decision that he meaningfully considered each of the factors before deciding how much weight to give the opinion." Id.

Here, Dr. Rominger, who is a clinical psychologist and Assistant Professor of Medicine at Wake Forest University Baptist Medical Center, provided an opinion as follows

> Shavonya Mason is my patient. I am treating her for anxiety, a cluster B personality disorder with histrionic and borderline traits, episodic mood disorder, attention deficit hyperactivity disorder (ADHD), post-traumatic stress disorder (PTSD), and pain disorder associated with physical and psychological factors. I first met with Ms. Mason in 2009 and then again in June 2013, both times for depression. She has been seeing me fairly regularly since June 2014. Treatments include a combination of cognitive-behavioral therapy (CBT), insight therapy, and supportive psychotherapy.
>
> Since I have been treating her, Ms. Mason has suffered from social anxiety, fatigue, irritability, restlessness, sleep disturbance, difficulty concentrating, and physical pain, among other symptoms. . . . [A]ll of her reported symptoms are consistent with at least one of her diagnoses.
>
> . . . .
> She is regularly nervous, jittery, and paranoid. She suffers from severe anxiety in social situations, which makes interacting with others extremely difficult, particularly people she does not know well. Ms. Mason's anxiety also contributes to her fatigue, sleep dysregulation, and difficulty concentrating.
> . . . .
>
> Ms. Mason's extreme anxiety in social situations often prevents her from accessing resources that she needs. For example, in 2017, Ms. Mason's case manager at the Department of Social Services asked her to come into the office so she could renew her food stamps. Ms. Mason reported to me that she would rather give up her food stamps than deal with the crowd at Social Services. During the same visit, she added that she is eligible for energy assistance, but has not claimed it for the same reason. More recently, during a therapy session in 2019, Ms. Mason expressed her desire to be admitted to inpatient care. I agreed that she would benefit from inpatient care based on the severity of her

10

symptoms at the time. Her options were already limited by her lack of health insurance and she refused to consider any options that required her to participate in groups. She was extremely hesitant to consider any treatment center where she did not have a preexisting connection. Ultimately, Ms. Mason did not receive inpatient care.

. . . .

Due to the combined effect of her personality disorder and anxiety, Ms. Mason is highly reactive and has great difficulty regulating her emotions. This reactivity, combined with her suspiciousness of others, frequently impairs her ability to function in the world. Because of her suspiciousness, paranoia, and related fears that she might hurt someone, Ms. Mason typically avoids social interaction and leaving her house, even to seek care or do errands. She tries to go to the grocery store when there are few people there and counts the cars in the parking lot before deciding whether to enter.

. . . .

In addition to her anxiety, Ms. Mason's histrionic and borderline traits interfere with her ability to control her emotional responses to social situations and in turn her perception of others. Already enduring extreme anxiety in social situations, Ms. Mason feels perceived slights very keenly, and these magnified emotions mean that her views of others can rapidly shift from idealization to devaluation. As a result, she is prone to emotional reactivity and outbursts.

Ms. Mason's persistent fears that she may hurt someone have been extraordinarily debilitating, as they contribute to her desire to self-isolate to protect others and herself. While Ms. Mason's anxiety and paranoia contribute to these fears, her inability to control her emotions has resulted in at least some verbal and physical altercations.

. . . .

Having worked with Ms. Mason for many years, I can confidently state that she has extreme difficulty interacting with others. Ms. Mason's severe social anxiety means that attempting to engage socially is extremely difficult, while her histrionic and borderline traits magnify the emotional and interpersonal stakes of any encounter. Her inability to contain these magnified emotions often places her in a situation where her best available coping mechanism is to flee to avoid an otherwise inevitable confrontation. Forcing Ms. Mason to interact with others she does not know would not only be highly distressing to her but would likely also be disruptive to those around her. . . .

In my opinion, Ms. Mason's difficulties getting along with people due to distrust and suspiciousness, and her unstable perceptions of others and magnified perception of emotional stakes due to her histrionic and borderline traits, would interfere with her ability to interact with people on a professional basis. She is likely to be limited in coping with other people, both one-on-one and in group

settings. Most days, her anxiety is debilitating. I believe that in a work place she would flee when she became overwhelmed by anxiety.

Although Ms. Mason has experienced periods of stability, they do not last. She is easily thrown off and loses control of her emotions. Ms. Mason has been managing her conditions with medication and regular psychotherapy for most of her adult life. Still, small incidents can easily trigger a downward spiral that derails her sincere efforts to improve her situation. My time working with Ms. Mason and my more than 20 years of experience as a psychologist lead me to believe that her prognosis does not include a level of improvement that would vastly increase her functioning.

(Tr. at 2713-16.)

As Plaintiff correctly notes, the ALJ mischaracterized much, if not all, of the evidence used to discount Dr. Rominger's opinion. First, the ALJ found that Dr. Rominger "has not consistently treated [Plaintiff] and there was a period of from 2019 to January 2021 where she was not receiving treatment." (Tr. at 2026.) However, the record clearly reflects that Dr. Rominger saw Plaintiff for an in-person visit on May 24, 2019, and teletherapy visits on April 16, 2020, and December 17, 2020, in light of COVID-19 precautions. (Tr. at 2608, 2655, 2693, 2699.) Thus, the ALJ's statement that "there was a period of from 2019 to January 2021 where she was not receiving treatment" is factually inaccurate on a key factor for weighing opinion evidence. Indeed, with regard to the length of the treatment relationship, the frequency of examination, and the nature and extent of the treatment relationship, the evidence reflects that Dr. Rominger first saw Plaintiff in 2009, and has been treating her regularly since at least May 2016. For the five-year period from May 2016 through March 2021 when the hearing was conducted, Plaintiff saw Dr. Rominger at least twice each year, and over 20 times total, for sessions of approximately one hour each. (Tr. at 1690-91, 1694-96, 1704-05, 2420, 2446, 1722, 1728, 1759, 1829, 1994, 1998, 2466, 2477, 2534, 2581, 2609,

12

2655, 2693, 2699, 2703, 2708.) Thus, Dr. Rominger has spent over 20 hours with Plaintiff over a five year period and has conducted several cognitive assessments and mental evaluations.

In addition, for the period of time between May 2019 and January 2021, the record reflects that in addition to the two teletherapy sessions in 2020, Dr. Rominger also noted that during that time Plaintiff also came to several appointments but left the waiting room before being seen. (Tr. at 2699.) This behavior is consistent both with Plaintiff's claims of anxiety in groups of people and her reports of leaving waiting rooms and other places if there were too many people. Notably, the medical record reflects multiple instances in which Plaintiff left without being seen (e.g., Tr. at 2002), including a particularly notable occasion in 2014 where she waited for a period of time and then became distressed, started crying on the phone to her case manager, and made statements that raised concerns that she was potentially suicidal, ultimately requiring Dr. Rominger to spend an extended period of time with her to try to calm her down and prevent her from discontinuing treatment altogether. (Tr. at 1488.) [6]

Moreover, the ALJ did not address or consider the extent to which Plaintiff's failure to keep her appointments was a result of the mental impairments themselves. See Pate–Fires v. Astrue, 564 F.3d 935, 945 (8th Cir. 2009) ("Courts considering whether a good reason supports a claimant's failure to comply with prescribed treatment have recognized psychological and emotional difficulties may deprive a claimant of the rationality to decide

---

[6] The records thus support Plaintiff's testimony that she left waiting rooms if there were too many people, and that providers modified Plaintiff's waiting room routine to accommodate her needs. (Tr. at 2070.) Treatment records similarly support Plaintiff's testimony that she declined to see new medical providers because she did not do well adjusting to new people and environments. (See, e.g., Tr. at 2070.) Similarly, the records also support Plaintiff's testimony that her anxiety and mental health impairments prevented her from participating in group therapy. (Tr. at 2067-68.)

whether to continue treatment or medication." (internal quotations omitted)). The Fourth Circuit has made clear that "the burden of producing evidence concerning unjustified noncompliance lies with the Secretary, . . . [and] the Secretary must develop a record establishing by substantial evidence that the claimant's impairment 'is reasonably remediable by the particular individual involved, given . . . her social or psychological situation,' and that this claimant lacks good cause for failing to follow a prescribed treatment program." Preston v. Heckler, 769 F.2d 988, 990–91 (4th Cir. 1985) (quoting Tome v. Schweiker, 724 F.2d 711, 714 (8th Cir.1984) (internal citations omitted)).

Thus, to the extent the ALJ rejected Dr. Rominger's opinion because Dr. Rominger had "not consistently treated her and there was a period of from 2019 to January 2021 where she was not receiving treatment," the ALJ's statement is both factually inaccurate and also fails to address the extent to which Plaintiff's failure to keep appointments or maintain even more frequent treatment was itself a result of her mental impairments.

Second, the ALJ discounted Dr. Rominger's opinion because "he was 'assisted' in preparing" it by law students working with Plaintiff's attorney. (Tr. at 2026.) In fact, Dr. Rominger's statement expressly provides as follows:

> I spoke with [Plaintiff's] representative from Duke Health Justice Clinic about my opinions regarding [Plaintiff's] diagnoses, symptoms, functioning, and prognosis. Based on my training and expertise, and the fact that I have been treating [Plaintiff] regularly since 2015 and was familiar with her prior to that, I feel qualified to give such an opinion. **Although [Plaintiff's] representative prepared this statement after our discussion, I have reviewed it carefully and made edits, and it accurately expresses my opinion and the information I relayed to [Plaintiff's] representative.**

(Tr. at 2010) (emphasis added). Dr. Rominger's medical records likewise note multiple meetings with Plaintiff's representatives regarding Plaintiff's impairments (Tr. at 2707, 2708,

2712.) Those records reflect that Dr. Rominger discussed with Plaintiff's representatives "how [Plaintiff's] mental health symptoms would likely interfere with her ability to work," and Dr. Rominger suggested that he re-administer several tests, including depression screening, anxiety screening, and cognitive assessment, which he did during Plaintiff's appointment on March 9, 2021, before providing his opinion. (Tr. at 2707, 2708-11.) He also met with Plaintiff's representatives again to answer their additional questions. (Tr. at 2712.) As Plaintiff correctly notes, the ALJ "provides no evidence that would show that the statement is not Dr. Rominger's genuine medical opinion." (Pl.'s Br. [Doc. #14] at 11), nor does she explain why the "assistance" rendered in this case would, in and of itself, render Dr. Rominger's opinion less persuasive or reliable.[7]

As the third reason for rejecting Dr. Rominger's opinion, the ALJ asserts that Plaintiff "has not appeared to want to help herself as she refuses treatment and has a reason for nearly every medication as to why not to take it." (Tr. at 2026.) To the extent the ALJ is relying on the same rationale as the first contention regarding gaps in the treatment record, the rationale fails for the reasons set out above. See Pate–Fires, 564 F.3d at 945 ("[F]ederal courts have recognized a mentally ill person's noncompliance with psychiatric medications can be, and usually is, the result of [the] mental impairment [itself] and, therefore, neither willful nor without a justifiable excuse."); Preston, 769 F.2d at 990–91. Earlier in her decision, the ALJ

---

[7] The ALJ also notes that "the pre-hearing brief is very close to identical to [Dr. Rominger's] opinion making it unclear how much of this is his opinion." (Tr. at 2026.) However, to the extent the ALJ is referencing Dr. Rominger's 2017 opinion and the 2017 pre-hearing brief, Dr. Rominger's opinion is dated November 27, 2017, prior to the date of the pre-hearing brief. (Tr. at 2010-12, 549-54.) Similarly with regard to the 2021 opinion and the 2021 pre-hearing brief, Dr. Rominger's opinion is dated March 25, 2021, a week prior to the pre-hearing brief. (Tr. at 2713-16; 2240-2252.) It is not surprising that the briefs would then rely heavily on Dr. Rominger's opinions to explain Plaintiff's impairments.

15

quoted a treatment note from Dr. Rominger relating that Plaintiff is "[g]enerally resistant to taking any medication other than clonazepam," also known as Klonopin. (Tr. at 2023, 2693.) The ALJ further noted Plaintiff's subjective reports of the problems she experienced when trying other medications:

> [Plaintiff] said the amitriptyline she took a couple of years ago caused headaches, that Seroquel and trazodone were too sedating, that she did not like Prozac, that the combination of Zoloft and trazodone caused her to see demons, and that Buspar caused headaches and made her want to hurt herself.

(Tr. at 2023) (citing Tr. at 2693. In the briefing, Plaintiff notes that "none of [Plaintiff's] treating physicians have ever expressed concern that she is exaggerating or being dishonest about the seriousness of her adverse reactions to many of the antidepressants she has tried," and, Plaintiff's providers, including Dr. Rominger, consistently describe her as compliant with her medications despite her negative experiences with certain drugs. (Pl.'s Br. at 12.) The record also reflects ongoing efforts by her providers, including a consultation by Dr. Rominger with other mental health professionals (Tr. at 2612), to try to find a medication option that Plaintiff can tolerate and afford and that will not cause her to terminate treatment, as has been her pattern in connection with her mental health condition. (Tr. at 915, 991, 1151, 1690, 1693, 1705, 1723, 1829, 1994, 2421, 2446.) Given this record, the ALJ has failed to provide any basis to use medication or treatment non-compliance as a basis to discredit Dr. Rominger's opinion.

Finally, the ALJ contends that Dr. Rominger's opinion "is not supported by the evidence in the record, including normal memory, judgement, insight, concentration, and thought content." (Tr. at 2026) (citing Tr. at 1096, 1737, 1802, 2390, 2495). However, the treatment notes cited by the ALJ relate to Plaintiff's treatment for physical, rather than mental,

16

complaints. Thus, they do not represent instances in which Plaintiff's mental health conditions were at issue or were specifically tested. As such, they have limited relevance to the issue of Plaintiff's overall mental health impairments.[8] See also Testamark v. Berryhill, 736 F. App'x 395 (4th Cir. 2018). Notably, Dr. Rominger's treatment notes reflect that from 2016 to 2021, on examination Plaintiff was alert and cooperative, with full facial expressions and good grooming, and occasionally with good insight and normal perception and reasoning, but also with examinations reflecting mildly loosened associations, limited insight and judgment (Tr. at 1690-91); mild cognitive impairment with impaired/limited insight and fair to poor judgment based on mental status examination and cognitive assessment (Tr. at 1694-96); mild agitation, flight of ideas, pressured speech and restless with anxious affect (Tr. at 1704-05); limited speech (Tr. at 2420); agitation and pressured speech (Tr. at 2446); flight of ideas, pressured speech, paranoid thought content, and limited insight (Tr. at 1722-23); perceptual distortions and delusional thought content (Tr. at 1728-29); flight of ideas, pressured speech and limited insight with questionable judgment (Tr. at 1759-60); mild distress and flattened affect (Tr. at 1829-30); suspiciousness, flight of ideas, and pressured speech with paranoid ideation (Tr. at 1994-95); aggressive behavior, pressured speech and suspiciousness, with paranoid ideation (Tr. at 1998-99); aggressive behavior, flight of ideas and scattered speech (Tr. at 2466-67); emotionally distressed and restless with paranoid thought content (Tr. at 2477-78); irritability

---

[8] The specific records cited by the ALJ are a 2012 office visit for a migraine (Tr. at 1096 (10F/207)), a 2017 neurology visit for headaches, with the treatment note also reflecting that she had recently been in an altercation and that on review of systems she was "nervous/anxious." (Tr. at 1736-39 (20F/20)); a 2017 Emergency Department visit for a headache (Tr. at 1799-1803 (21F/53); a 2016 neurology visit for headaches, with the treatment note also reflecting that as a result of a recent fight with her family she had been hit in the head by her brother, and that on review of systems she was "nervous/anxious" (Tr. at 2389-92 (26F/130)); and a 2017 visit to a podiatrist for right foot pain (Tr. at 2495 (28F/33)).

17

and mild agitation (Tr. at 2534-35); irritability, learning difficulty, mood swings, agitation, flight of ideas and pressured speech (Tr. at 2581-82); irritability, mood swings, phobia, possible auditory hallucinations, and poor insight (Tr. at 2608-09); tearful affect, flight of ideas, pressured speech and rigid thought content (Tr. at 2693-94); flight of ideas, scattered thought process with idiosyncratic reasoning, pressured speech and suspiciousness (Tr. at 2699-2700); flight of ideas, pressured speech and scattered thought process with idiosyncratic and rigid thought content (Tr. at 2703-04); and labile affect, mixed insight and judgment, and pressured speech with flight of ideas (Tr. at 2708-09). Thus, it appears that Dr. Rominger's opinion is supported by evidence in the record.

In addition, Dr. Rominger's notes also reflect diagnosis of episodic mood disorder, which Dr. Rominger explained was "a mood disorder similar to bipolar disorder" (Tr. at 2714), and Cluster B Personality Disorder with histrionic and borderline traits.[9]   The treatment records repeatedly note paranoid ideation and raise concern that Plaintiff would harm others, including evidence of assaults, threats, and urges to hurt others that she viewed with suspicion or paranoia.  For example, the records reflect involvement in an altercation with her brother in 2014 (Tr. at 1001); involvement in a fight involving her mother and brother in January 2016 resulting in her being hit in the face or head (Tr. at 2384, 2389); her statement to Dr. Rominger in August 2016 that she was trying to resist the urge to hurt others (Tr. at 2420); a verbal argument with her neighbor in September 2016 resulting in her being shoved or punched (Tr. at 2428); her statement to Dr. Rominger in October 2016 that she was still trying to resist the

---

[9] The ALJ did not acknowledge or address these impairments and considered all of Plaintiff's mental health impairments as part of Plaintiff's depression and anxiety.

18

urge to hurt others, with the record also noting that she had walked out of a Daymark group in frustration when she "evidently had difficulty comprehending the materials" and lost her temper with her representatives in her Social Security case; a fight with her boyfriend in January 2017 resulting in her being choked (Tr. at 1730, 1759); a delusional pregnancy in March 2017, culminating in her becoming "aggressive and hostile" in the Emergency Department and then "storm[ing] out" of the hospital (Tr. at 1764-68); her acknowledgment to Dr. Rominger in August 2017 of "homicidal feelings at times" and that "by avoiding people she has avoid[ed] assault charges" (Tr. at 1994-95); her statement to Dr. Rominger in September 2017 admitting to "frequently wanting to hurt people" but not acting on those impulses (Tr. at 1998); an incident in September 2017 where she became verbally aggressive with a stranger who she thought was looking at her, telling him she would knock his eyes out (Tr. at 1998-99); threats toward the spouse of a deceased friend in October 2017, threatening that she would "tear his skin off" (Tr. at 2466); threats toward her brother in December 2017 that "she has thought of forty-two ways to kill him" if he did not change his behavior toward their mother (Tr. at 2477); her statement to Dr. Rominger in December 2018, that she was concerned "she might lash out and hurt somebody" (Tr. at 2581); an attempt to work at the end of 2019 that lasted for three days and resulted in her blowing up at a coworker and then walking out because she was afraid she would physically assault the coworker and was trying to not to get an assault charge (Tr.at 2065); an incident in a store in April 2020, in which Plaintiff left the store to try to avoid a confrontation because she didn't want "to get locked up" (Tr. at 2655); and a notation by Dr. Rominger in December 2020 that Plaintiff's mother had described her as "getting very aggressive" (Tr. at 2693).

Finally, the Court notes that one of the most important factors in evaluating opinion evidence is consistency, which the ALJ did not address. Importantly here, Dr. Rominger's opinion is consistent with the opinion of the consultative examiner, Psychiatrist Stephen Sanders, who examined Plaintiff for several hours in 2015, and noted that Plaintiff was cooperative, oriented, and did not exaggerate or minimize symptoms, but with an IQ in the borderline range of intellectual functioning, poor impulse control, major depression, recurrent panic disorder, agoraphobia, posttraumatic stress disorder, and learning disorder, and with the following conclusion:

> In my opinion, the claimant would have difficulty retaining and following instructions. She would have difficulty performing simple repetitive tasks. . . . She experiences difficulty being around people due to her anxiety, panic disorder, and would have difficulty tolerating the stress and pressure associated with day-to-day work activity due to ongoing problems with depression and panic symptoms.

(Tr. at 1630). Dr. Sanders as the Consultative Examiner further concluded that Plaintiff would not be capable of handling benefits in her own interest, and that her mother would need to handle her benefits. (Tr. at 1630.) Thus, the only mental health professionals who spent time with Plaintiff, Dr. Sanders and Dr. Rominger, both agreed on the extensiveness of Plaintiff's mental health impairments, but the ALJ gave them both little weight.

Overall, the Court is hard-pressed to agree that the ALJ provided proper, well-supported reasons to negate the detailed opinion of Plaintiff's long-time mental health provider. As set out above, the express purpose of the treating physician rule is to "provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) . . . that cannot be obtained from the objective medical findings alone or from reports of individual examinations." 20 C.F.R. § 404.1527(c)(2). Because the ALJ failed to apply this rule as

interpreted by the Fourth Circuit in <u>Arakas</u> and <u>Dowling</u>, substantial evidence fails to support the administrative decision, and remand is required.

The Court notes that the ALJ's treatment of the opinion evidence also relates to Plaintiff's alternative argument, that the ALJ's determination of the RFC regarding Plaintiff's social functioning is not supported by substantial evidence because the ALJ mischaracterized the evidence or cherry-picked evidence in the record. In setting the RFC, the ALJ found Plaintiff capable of "occasional interaction with the general public," meaning that she could interact with the general public for up to a third of an eight-hour workday, or over 2.5 hours of daily interaction with the general public. The ALJ also determined that Plaintiff could have "frequent interaction with coworkers and supervisors," meaning that she could interact with coworkers and supervisors for up to two thirds of the workday, or over 5 hours of interaction per day, but she could not perform work "requiring teamwork for task completion." (Tr. at 2022.) This determination was directly affected by the evaluation of the opinion evidence from Dr. Morris and Dr. Sanders.[10] As such, the Court recommends remand for further consideration of these issues.

---

[10] The Court also notes that in the decision, the ALJ found that "Plaintiff's acknowledged daily activities, including preparing meals, performing household chores, coloring, researching various topics on her phone, and maintaining close interpersonal relationships with friends and family, . . . demonstrated a greater social and cognitive ability than alleged." (Def.'s Br. [Doc. #16] at 18) (citing Tr. at 2022-23, 2055, 2058-62, 2655). However, very few of these findings relate to social functioning in any meaningful way, and as for Plaintiff's relationships with friends and family, Plaintiff testified that she sometimes experienced anxiety around those close to her, cutting short visits even with close friends because their movements caused Plaintiff to become aggressive and anxious, and the record notes fights and threats toward her brother, her former boyfriend, and her neighbor, as noted above. The ALJ further "noted that Plaintiff's ability to travel on public transportation to New York and help care for her friend's small child was inconsistent with her allegation that she experiences debilitating, uncontrollable anxiety." (Def.'s Br. at 18) (citing Tr. at 2022-23, 1690, 1995, 2055). In recounting Plaintiff's ability to travel, the ALJ acknowledged Plaintiff's testimony that, on her trips to New York, "she takes the bus there and sits in a seat by herself with her headphones on." (Tr. at 2022; <u>see also</u> Tr. at 2055, 2066-67.) Defendant argues that this qualification of Plaintiff's activities distinguishes her case from <u>Arakas</u>, where the ALJ relied on Plaintiff's activities to discount the limiting effects of her impairments without

Case 1:21-cv-00762-WO-JEP   Document 17   Filed 03/14/23   Page 21 of 22

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be REVERSED, and that the matter be REMANDED to the Commissioner under sentence four of 42 U.S.C. § 405(g). The Commissioner should be directed to remand the matter to the ALJ for proceedings consistent with this Recommendation. To this extent, Defendant's Motion for Judgment on the Pleadings [Doc. #15] should be DENIED, and Plaintiff's Motion for a Judgment on the Pleadings [Doc. #13] should be GRANTED.

This, the 13th day of March, 2023.

/s/ Joi Elizabeth Peake
United States Magistrate Judge

---

considering the extent of those activities. (Def.'s Br. at 18) (citing Arakas, 983 F.3d at 96); see also Woods v. Berryhill, 888 F.3d 686, 694 (4th Cir. 2018) and Lewis v. Berryhill, 858 F.3d 858, 868, n.3 (4th Cir. 2017). However, additional evidence of Plaintiff's social activities shows that the activities relied upon by the ALJ were limited well beyond the extent acknowledged in the ALJ's decision. In the case of Plaintiff's travels, for example, Plaintiff testified that her aunt pays for two bus seats so that no one can sit next to her, that Plaintiff refuses to interact with anyone else while riding, that Plaintiff has to wait for everyone else to get off the bus before disembarking, and that Plaintiff's aunt picks her up directly from the bus stop so that she doesn't have to interact with other people. (Tr. at 2066-67.) With regard to caring for her friend's child, Plaintiff reported to Dr. Rominger in 2016 that she had cared for the three-year-old "for about six months but had to quit watching him because" of an increase in her mental symptoms in 2015 and the record reflects that Plaintiff previously lost custody of all four of her children by action of Child Protective Services. (Tr. at 1690, 915, 922.) Plaintiff also testified that she wanted to earn her GED, but attempted to attend a class and had to leave because she could not stay in the room with more than four people. (Tr. at 2059, 2063-64.) Plaintiff related similar problems regarding her ability to use a laundromat, noting that she would postpone doing her laundry if there were too many people there. (Tr. at 2060-61.) She further explained that, even when she did not have to talk to other people, she felt a need to keep track of what others around her are doing at all times. (Tr. at 2061.) Plaintiff admitted that she might be able to work "in a backroom type situation with only a couple of other people," but doubted that positions of that type would be available in businesses open to the public. (See Tr. at 2071-72.) It appears that Plaintiff's attorney repeatedly tried to ask the vocational whether jobs of this type occur in substantial numbers in the national economy, but the vocational expert failed to grasp the thrust of this question or directly answer it. (See Tr. at 2080-88.)